### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| **LUIS GONZÁLEZ CABÁN, et al,** | |
| **Plaintiffs,** | |
| **v.** | **CIVIL NO. 14-1507 (GAG)** |
| **JR SEAFOOD, et al.,** | |
| **Defendants.** | |

### OPINION, ORDER  AND
### CERTIFICATION TO THE PUERTO RICO SUPREME COURT

Luis González Cabán ("González") filed this lawsuit alleging that after consuming a toxic shrimp at Restaurante El Nuevo Amanecer, in Coamo, Puerto Rico on February 19, 2004, he suffered paralytic shellfish poisoning that permanently deteriorated his health to the point of incomplete quadriplegia, which bound him to a wheelchair.[1]  (Docket No. 86-1.)

On June 24, 2014, González and other family members,[2] all residents of the State of Florida, (collectively "Plaintiffs") filed a complaint invoking this court's diversity jurisdiction under to 28 U.S.C. § 1332, against JR Seafood Inc., Integrand Insurance Company, Packers

---

[1] Paralytic Shellfish poisoning is an "[i]llness caused by consuming shellfish contaminated with certain dinoflagellates that produce saxitoxin and other toxins."  Some of its symptoms include: "numbness or tingling in the face, lips, tongue, and extremities.  There may also be a headache, fever, rash, nausea, and vomiting, with impaired coordination, changes in mental status, incoherent speech, and difficulty in swallowing, flaccid paralysis, and respiratory failure in severe cases.  Death can occur within two hours of ingestion of the contaminated fish."  J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder, vol. 4 M-PQ, 63 (2013).

[2] González's father, Braulio González Reyes, and González's daughters, Jenifer González Maldonado and Arlene González Soto, are also named Plaintiffs seeking compensatory damages for the emotional distress suffered as a result of González's intense physical and emotional damages.  (Docket No. 86-1.)

CIVIL NO. 14-1507 (GAG)

Provisions of Puerto Rico Inc. ("Packers"), Ramón Gutiérrez, Evaristo Rivera Berrios d/b/a Restaurante El Nuevo Amanecer ("Restaurante el Nuevo Amanecer"), and Cooperativa de Seguros Múltiples (collectively "Defendants") seeking damages suffered as a result of González's intoxication.[3]   (Docket No. 86-1.)   Pending before this court is Packers' Motion to Dismiss Plaintiffs' First Amended complaint pursuant to FED. R. CIV. P. R. 12(b)(6).   (Docket No. 60.) Defendants Integrand Assurance, Evaristo Rivera-Berrios and Cooperativa de Seguros Multiples later joined Packers' Motion to Dismiss.   (See Docket Nos. 94 & 99.)   Defendants essentially argue that: (1) Plaintiffs' complaint fails to sufficiently allege the application of the strict liability doctrine to the instant case; and (2) Plaintiffs failed to establish that Defendants, as part of the supply chain of the allegedly contaminated shrimp, had a duty to perform tests to detect the presence of saxitoxin.   Id.

After careful review of the parties' allegations and applicable law, the court finds that this case relies solely on an unsettled issue of Puerto Rico law, as to which this court cannot reasonably predict how the Puerto Rico Supreme Court would rule.   Because there is no clear precedent to guide this court's ruling, the undersigned holds that the prudent course of action is to **ABSTAIN** from ruling on Defendants' Motion to Dismiss at Docket No. 60 and **CERTIFY** the issue of law to the Puerto Rico Supreme Court.

I.      **Factual and Procedural Background**

For purposes of this Opinion and Order, the court recites Plaintiffs' alleged facts that are most relevant to the present issue.

---

[3] Plaintiffs originally first filed suit against Defendants in the Puerto Rico Commonwealth Court of First Instance in Aibonito, Case No. BDP-2006-0004.   (See Docket No, 87 at 44-45.)   Per Plaintiffs request, this case was voluntarily dismissed at some point during 2014.

CIVIL NO. 14-1507 (GAG)

JR Seafood was, at all times pertinent, an importer, seller, distributor and/or packager of seafood, including shrimp.  (Docket No. 86-1 at 2 ¶ 2.)  Although JR Seafood is no longer in operation, it is included in this complaint as a nominal defendant while Plaintiffs claim their insurance company, Integrand Assurance, is liable for their damages.  Id.  Packers was, at all times pertinent, an importer, seller, distributor and/or packager of seafood, including shrimp.  Id. ¶ 3. Ramon Gutierrez, d/b/a/ GB Trading was also, at all times pertinent, an importer, seller, distributor and/or packager of seafood, including shrimp.  Id. ¶ 4.  Restaurante el Nuevo Amanecer, at all times pertinent, owned and operated a restaurant in Coamo, Puerto Rico.  Id. ¶ 5.  Cooperativa de Seguros Multiples is the insurer of Restaurante El Nuevo Amanecer.  Id.

In or about August 2004, JR Seafood imported a shipment of shrimp to Puerto Rico.  (Id. at 3 ¶ 1.)  The shrimp was originally caught in Calcutta, India.  Id.  JR Seafood, in turn, sold some of the shrimp to Packers, who then sold the shrimp to GB Trading.  Id.  On December 21, 2004, GB Trading sold the shrimp product to Restaurante El Nuevo Amenecer.  Id. at 3 ¶ 1.

On February 19, 2005, González went to Restaurante El Nuevo Amenecer in Coamo, Puerto Rico and ordered a plate containing shrimp product.  Id. at 3 ¶ 2.  As he was eating the shrimp, González began to feel a burning and stinging sensation in his mouth and stomach.  Id. Minutes later, his health commenced to deteriorate.  Id.  He began to suffer the following symptoms: diarrhea, vomiting, hypotension, hypokalemia, dizziness, syncope, sensory and motor disturbance, quadraparalysis, acute inflammatory demyelination (myelitis) of the spine, renal failure, acute tubular necrosis, thrombocytopenia, acute gastroenteritis, anemia, leucytosis, acidosis, azotemia and diffuse skin rash over his abdomen and arm.  (Docket No. 86-1 at 2-3, ¶ 2.)

González was taken to the hospital where he remained in critical condition for various days.  Id. at 3, ¶ 3.  After he was stabilized, he began a long recovery process that included painful

CIVIL NO. 14-1507 (GAG)

and difficult therapeutic treatment.   (Docket No. 86-1 at 3, ¶ 3.)   González was unable to completely recuperate his health.  Id.  He was diagnosed with incomplete quadriplegia and remains permanently bound to a wheelchair.  Id.  He only regained limited mobility in his arms and hands. Id.  González has no bladder control, no sphincter control and has lost all sexual desire and capacity.  Id.  After being treated in hospitals in Puerto Rico as well as in the United States mainland, medical experts determined González's conditions were caused by Paralytic Shellfish Poisoning from the shrimp he ate at Restaurante el Nuevo Amanecer on February 19, 2004.  (Id. at 3, ¶ 4.)  The poisoning allegedly occurred from consuming a shrimp that contained saxitoxin, a natural toxin that encapsulated in the shrimp's "viscera" (the intestine).  Id.

Plaintiffs contend that the allegedly contaminated shrimp was a defective product and that Defendants, as sellers, distributors and/or packagers of the defective product, and their respective insurance companies, are liable under the product liability principles of Puerto Rico tort law. (Docket No. 86-1.)  Specifically, Plaintiffs invoke the strict liability doctrine under the principles of failure to warn about the product's defect and implied warranty.  Id.  Plaintiffs further allege that Defendants are joint and severally liable for providing an unsafe food product in violation of specific public policy that aims to protect the consumer from damages that arise when a product that is placed in the market is unfit for human consumption.  Id.

It is important to note that, after Defendants moved to dismiss Plaintiffs' amended complaint, Plaintiffs responded in opposition to said motion and also requested leave to amend their complaint once again.  (Docket No. 86.)  Per leave of court, Plaintiffs amended their complaint and included additional, more specific details and allegations as to Plaintiffs' strict liability claim.  Id.  Also, Plaintiffs included a cause of action under Puerto Rico's general tort statute, Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. LAWS ANN. tit. 32, §

CIVIL NO. 14-1507 (GAG)

5142, arguing that Defendants were negligent for failing to take "all necessary precautions to detect, discard or clean the [contaminated] shrimp," and other local law claims.[4]  (Docket No. 86-1.)

Currently pending before this court is Defendants' Motion to Dismiss Plaintiffs' First Amended complaint pursuant to FED. R. CIV. P. R. 12(b)(6).  (Docket No. 60.)  Defendants argue that: (1) Plaintiffs' complaint fails to sufficiently allege the application of the strict liability doctrine to the instant case; and (2) Plaintiffs failed to establish that Defendants, as part of the supply chain of the allegedly contaminated shrimp, had a duty to perform tests to detect the presence of saxitoxin.  Id.  Plaintiffs opposed Defendants' Motion to Dismiss.  (Docket No. 86.) Per leave of court, Packers replied Plaintiffs' opposition.  (Docket No. 91.)  Plaintiffs then filed a sur-reply.  (Docket No. 97.)

Under Rule 15(c) of the Federal Rules of Civil Procedure, pleading amendments relate back to the original pleading when the claim(s) it asserts arise from the same conduct, transaction or occurrence.  FED. R. CIV. P. R. 15(c).  "A pleading that has been amended under Rule 15(a) supersedes the pleading it modifies and remains in effect throughout the action unless it subsequently is modified. Once an amended pleading is interposed, the original pleading no longer performs any function in the case."  Wright and Miller, Federal Practice & Procedure 6 § 1476 Effect of an Amended Pleading (3d ed. 2015).  As such, although Defendants' Motion to Dismiss

---

[4] Plaintiffs' second amended complaint asserts the following causes of action under Puerto Rico law: (1) violation of the legal warranty against defects in a product (in Spanish *saneamiento por vicios ocultos*), P.R. LAWS ANN. tit. 31 §§ 3801, 3831, 3841-3843; (2) Puerto Rico's doctrine of economic benefit, claiming that because Defendants benefitted from the sale, distribution and/or packaging of the contaminated shrimp, they are vicariously liable for the negligent actions of their employees.  (Docket No. 86-1 at 4.)

5

CIVIL NO. 14-1507 (GAG)

addressed Plaintiffs' strict liability allegations at Docket No. 32, the court examines the pending

motion as addressed to Plaintiffs' amended strict liability allegations at Docket No. 86-1.[5]

## II.    Discussion

Defendants' main contention is that that the common-law strict liability doctrine, incorporated by the Puerto Rico Supreme Court in Castro v. Payco, 75 P.R. Dec. 59 (1953) (certified translation at Docket No. 80-1), and Mendoza v. Cervecería Corona, 97 P.R. 487, 499 (1969) (certified translation at Docket No. 80-3) is limited to *manufacturing* defects of *fabricated* products, and thus, it does not apply to the facts of this case since the shrimp's alleged defect was not a result of manufacturing.  (Docket No. 60 at 6-7.)  In support of their argument, Defendants outline the history of the strict liability doctrine in Puerto Rico to further stress that because the allegedly poisonous shrimp is not a manufactured or fabricated product, it does not constitute a defective product, pursuant to Puerto Rico Supreme Court precedent.

To address this argument, the court turns to the current state of the law in Puerto Rico. Article 1802 makes persons responsible for the damage caused by their negligence.  Tit. § 5141. Under this principle, the Puerto Rico Supreme Court incorporated the common-law strict liability theory from the California Supreme Court ruling in Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900-901 (Cal. 1962)).  See Mendoza, 97 P.R. at 499; Guevara v. Dorsey Labs., Div. of Sandoz, Inc., 845 F.2d 364 (1st Cir. 1988).

There are three types of defects in products liability cases that warrant application of the strict liability doctrine; these are: manufacturing defects, design defects, and defects for failure to

_____

[5] Moreover, the court clarifies that, contrary to Plaintiffs' averment, their second amended pleading does not render Defendants' Motion to Dismiss moot.  "[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending. If some of the defects raised in the . . . motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.  To hold otherwise would be to exalt form over substance."  Wright and Miller, Federal Practice & Procedure 6 § 1476 Effect of an Amended Pleading (3d ed. 2015).

CIVIL NO. 14-1507 (GAG)

provide suitable instructions or warnings. See Rivera v. Superior Pkg., Inc., 132 P.R. Dec. 115, 127, Offic. Trans. Slip Op. at 8. (1992)  As to manufacturing defects, "[the Puerto Rico Supreme Court] adopted the definition of 'defect' suggested by Chief Justice Traynor in Greenman, to the effects that '[a] defective product may be defined as one that fails to match the average quality of like products, and the manufacturer is then liable for injuries resulting from deviations from the norm.'"  Id. at 7 (quoting Mendoza, 97 P.R. at 499 n.7); see also Montero-Saldaña v. Amer. Motors Corp., 107 P.R. Dec. 452, 7 P.R. Offic. Trans. at 501 (1978).

The Greenman Court established that, for purposes of product liability claims, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being' and that 'liability is not one governed by the law of contract warranties but by the law of strict liability in tort.'"  Rivera, Offic. Trans. Slip Op. at 6 (quoting Greenman, 377 P.2d at 900-01). "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." Greenman, 377 P.2d at 901; see also Mendoza, 97 P.R. at 499.

> [T]he justification for the strict liability has been said to be that the seller, by marketing his product for use or consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed on those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum protection at the hands of someone, and that the proper persons to afford it are those who market the product.

Mendoza, 97 P.R. at 499 (quoting Section 402A of the Restatement of Torts (Second),

CIVIL NO. 14-1507 (GAG)

Restatement of Torts (Second) (Am. Law Inst. 1965) at 349-50).

The doctrine of implied warranty is a derivative of strict liability.  First recognized by the Puerto Rico Supreme Court in <u>Castro</u>, the principle of implied warranty as widely described "[i]n most of the states of the Union, [that] the person who serves or sells a food product for human consumption tacitly warrants that the product is healthy and appropriate for consumption by man." 75 P.R. at 73-74.  This case first came to life when the plaintiff became sick and suffered damages from a defective ice cream product that he bought directly from the defendants, who were the manufacturers of the product.   <u>Id.</u>

The <u>Castro</u> court, when incorporating the common-law strict liability doctrine, looked to the State of Louisiana —where like Puerto Rico the legal system also stems from civil law tradition—  has also incorporated the strict liability principles in line with the <u>Greenman</u> rationale that:

> the seller of a product for human consumption is liable for damages that the buyer could suffer if the product proves harmful to health, which establish the principle that every person should know of the qualities, good or bad, of the things he manufactures in the practice of his art, trade or business, and that lack of such knowledge is imputed to him as a fault rendering him liable to the purchasers of the products manufactured by him for any damages resulting from vices or defects therein, of which he did not apprise them and of which the buyers were unaware.

<u>Castro</u>, 75 P.R. at 68-69 (citing Louisiana Supreme Court cases <u>Boyd v. J.C. Penny Co.</u>, 195 So. 87 (La. Ct. App. 1940); <u>Ogden v. Rosedale Inn</u>, 189 So. 162 (La. Ct. App. 1939);  <u>Kelly v. Ouachita Dairy Dealers Cooperative Assn'</u>, 175 So. 499 (La. Ct. App. 1937);  <u>MacLehan v. Loft Candy Stores</u>, 172 So. 367 ((La. Ct. App. 1937).  The court went on to state that the presumption that a seller, as manufacturer of the thing sold, is "cognizant of any latent defect caused by such process and against which reasonable diligence might have guarded."   <u>Castro</u>, 75 P.R. at 69 (quoting <u>Kellogg Bridge Co. v. Hamilton</u>, 110 U.S. 108, 116 (1938)).  Said presumption is the root

CIVIL NO. 14-1507 (GAG)

of the implied warranty principle.  "If the buyer relied, . . . on the judgment of the seller, who was

the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the

use for which it was designed  . . . ."   <u>Castro</u>, 75 P.R. at 69.

Further, the Puerto Rico Supreme Court officially incorporated and applied the <u>Greenman</u>

manufacturer's strict liability rule for defective products in <u>Mendoza</u>, 97 P.R at 499.  <u>See</u> <u>also</u>

<u>Montero-Saldaña</u>, 7 P.R. Offic. Trans. 501 (1978).  "In order to fill a gap in our body of laws, [the

Puerto Rico Supreme Court] adopted, through case law, the U.S. common law products liability

principles . . . to develop this field . . .  notwithstanding the fact that our legal system is rooted in

the Civil Law that puts emphasis on positive or written law."  <u>Rivera</u>, Offic. Trans. Slip Op. at 5-6

n.4 (citing <u>Mendoza</u>, 97 P.R. at 487).

A cause of action for failure to warn of a product's defects also stems from the same

principle.

> The duty to warn in general is limited to hazards not commonly known to the
> relevant public. Section 388 of the Restatement, in a slightly different context,
> reflects the same principle: one who supplies another with a chattel is under a duty
> to inform of its dangerous character insofar as he is aware of it, 'if, but only if, he
> has no reason to expect that those for whose use the chattel is supplied will
> discover its condition and realize the danger involved.' Restatement (Second) of
> Torts, § 388, Comment on clause (b). The courts have recognized this principle in
> their description of the scope of a drug manufacturer's duty to warn: 'The warning
> should be *sufficient to appraise a general practitioner* as well as the 'unusually
> sophisticated medical man' of the dangerous propensities of the drug.'

<u>Guevara</u>, 845 F.2d at 367 (quoting <u>McEwen v. Ortho Pharmaceutical Corp.</u>, 270 Or. 375, 528

P.2d 522, 529 (1974)).

In light of the strict public policy protecting consumers, the rationale behind this principle

is to benefit the consumer by lessening the burden of proof "eliminating the requisite negligence

factor of a general tort claim, therefore 'the manufacturer's strict liability theory excludes the

9

**CIVIL NO. 14-1507 (GAG)**

requirement that defendant's negligence be proven." <u>Rivera</u>, Offic. Trans. Slip Op. at 6-7 n.5. Specifically, "[a] plaintiff in this type of case must first establish the existence of the product's defect, and second, that said defect was the legal cause of the damage or injuries suffered," <u>id.</u>, "[u]nder the strict liability rule governing cases of this kind in our legal system, the injured party need not prove the negligence of the manufacturer or the seller, but must prove that the product was defective." <u>Rivera</u>, Offic. Trans. Slip Op. at 6-7 n.5.

Notwithstanding this holding, the <u>Mendoza</u> Court limited the scope of the manufacture's responsibility by noting that "the manufacturer is not the insurer of every damage [its] products may cause." <u>Mendoza</u>, 97 P.R. at 499.  The court narrowed the extent and application of this doctrine, and stated "although the consumer does not have to directly establish manufacturer negligence, the manufacturer is not the insurer of all the damages that his products might cause." <u>Id.</u>  It went further and provided hypothetical situations to illustrate different scenarios in which a manufacturer can and cannot be strictly liable, such as:  "[a] soft drink bottling company is liable for the injuries caused by the presence of a decomposed mouse in one of its soft drink bottles, but it is certainly not liable for the cavities that may be caused by the sugar used in the soft drink.  If the damage is not attributable to a product defect, there is no basis for the application of the standard of absolute liability." <u>Id.</u>

In the present case, in light of this case law, Defendants argue that González's damages were allegedly caused by the natural toxin found in the shrimp that he consumed and thus unlike the defective products that gave rise to the aforementioned Puerto Rico Supreme Court cases, i.e. an ice cream and a malt beverage.  Defendants posit that because shrimp is caught in the wild, packed and supplied forward, it never undergoes a manufacturing or fabrication process, and thus should not be analyzed under the strict liability doctrine.  (Docket No. 60 at 4.)

CIVIL NO. 14-1507 (GAG)

In support of their argument, Defendants provide a Resolution of the Puerto Rico Supreme Court where Justice Negrón García issued a concurring vote that mirrors their same argument.[6] Mendez-Corrada v. Ladi's Place, 127 P.R. Dec. 568, Offic. Trans. Slip Op. (1990) (certified translation at Docket No. 80-2).    In Mendez-Corrada, the plaintiff invoked the strict liability doctrine for the damages endured from eating a fish contaminated with ciguatera.  The Puerto Rico Court of First Instance dismissed the plaintiff's cause of action seeking damages for his ciguatera intoxication.    On appeal, the Puerto Rico Supreme Court denied writ of certiorari, but, nevertheless, Justice Negrón García issued a concurring vote, opining that the strict liability doctrine set forth in Mendoza and Castro "does not govern the case under our consideration . . . [because t]hat type of liability seeks to protect the consumer against the manufacturer's negligence."  Id. at 2.

In support of his rationale, Justice Negrón García enumerated the factors that influenced his reasoning: (1) "there is no available method for detecting a ciguatoxic fish when it is caught or either before or after it is distributed for sale. It is discovered upon human consumption;" (2) [ciguatera] cannot be destroyed by conventional cooking methods, such as frying, baking, boiling, etc., nor can it be eliminated by conventional fish handling and processing methods such as drying, salting, smoking or freezing; (3) [ciguatera] is not detectable from the smell or appearance of the fish; and (4) that "there are more than four hundred species of fish susceptible to this type of poisoning.  The periods and geographic distribution of outbreaks of poisoning are sporadic and

---

[6] This court is cognizant that a resolution of the Puerto Rico Supreme Court, denying a petition of certiorari, is not binding precedent because, in doing so, the court never had jurisdiction to entertain the issue. See Puerto Rico Supreme Court Rule 3, 44(b) & (d); Colón Alicea v. Frito Lay, 186 P.R. Dec. 135 (2012). However, the undersigned includes the concurring vote in this petition for certification considering it is highly relevant to the present issue.

CIVIL NO. 14-1507 (GAG)

unpredictable." Mendez-Corrada, Offic. Trans. Slip Op. at 1-2.  In light of the above, Justice Negrón García reasoned that there was no way of preventing a consumer's potential harm.  Id.

As such, Justice Negrón García went on to conclude that the plaintiff's situation fell outside the scope of the strict liability's protection because it was not a manufactured product.

> Fish poisoning caused by ciguatera is not caused by a manufacturing process or by the ingredients or the cooking techniques employed.  It is caused by one or various toxins accumulated in the fish's muscles.  In the words of the learned trial court, the hand and the will of man have absolutely nothing to do with this natural process.

Id. at 2.  He catalogued the situation as "an act of God that does not generate liability."  Id. (citing Jiménez v.Pelegrina Espinet, 112 P.R. Dec. 700 (1982)).

Turning to the instant case, Defendants argue that the reasoning behind the Mendez-Corrada concurrent should be followed by this court.  In support of their argument, Defendants turn to explain the scientific similarities between ciguatera and saxitoxin.  (Docket No. 60 at 10-11.)  Relying on the expert testimony of Plaintiffs expert witness, Dr. Goldstein, Defendants explain that saxitoxin is developed by a shrimp's diet.  (Docket No. 60-1)  Its formation is the result of a shrimp's consumption of dinoflagellates.  Id.

As such, Defendants contend that, as reasoned in Justice Negrón García's concurring vote, the strict liability doctrine does not apply to the instant case because the allegedly defective product that caused González's damages was not manufactured by man or a result of a fabrication process, consequently falling outside the scope of the protection established in Castro and Mendoza. Id.

Lastly, Defendants argue in their motion that Federal Regulations do not impose upon importers a duty to perform tests in shrimp.  (Docket No. 60 at 12.)  As such, Plaintiffs' allegations are insufficient and fail to point to any legal authority that imposes upon them an obligation of

CIVIL NO. 14-1507 (GAG)

performing tests on shrimp to discover natural toxin contamination.  Id.   Moreover, Defendants contends that the Code of Federal Regulations does not impose upon them the obligations that Plaintiffs allege.  Id.

Plaintiffs object to Defendants' entire theory.  (Docket No. 86.)  They posit that, under the strict liability theory, Defendants, as members of the supply chain of the defective product allegedly caused González's damages and thus are strictly liable for the defective product.  Id.   To wit, they argue that, according to the Puerto Rico Supreme Court precedent, distributors and sellers of a defective product are joint and severally liable before a consumer even if the product's defect cannot be fixed.  Id. at 4.  In support of their contentions, Plaintiffs point to Ferrer v. General Motors, 100 P.R. Dec. 244, 250 (1971);[7]  Mendoza, 97 P.R at 499; and Aponte Rivera v. Sears Roebuck, 144 P.R. Dec. 830, 838-89 n.6, 1998 P.R.-Eng. 324, 486 (1998).

As such, Plaintiffs dispute Defendants' proposition of Justice Negrón García's concurring vote.  Plaintiffs posit a different interpretation of the Mendez-Corrada concurring vote to argue it is inapplicable to the facts of the instant case.   They contend that Justice Negrón García's reasoning was predicated upon the fact that back in 1990, no methods were available to detect the presence of ciguatera in fish products, therefore his concurring vote aimed to clarify his stance that strict liability should not be imposed upon undetectable defects.  (Docket No. 97 at 7.)  For that reason, they contend that because at the time of the events there were methods to detect the presence of saxitoxin in food products, the Mendez-Corrada rationale is not relevant to the present issue.

---

[7] Plaintiffs' reference of Ferrer v. General Motors is erroneous.  Said case addresses contractual "breach of warranty" claims under the Puerto Rico Civil Code, not strict liability under tort law.  See 100 P.R. Dec. at 244.

13

CIVIL NO. 14-1507 (GAG)

Plaintiffs' posture is not completely accurate.  On one hand, Plaintiffs have alleged since the beginning of this litigation that, at the time of the events, there were "methods to detect and deal with the presence of saxitoxin in shrimp."  (Docket No. 32 ¶ 5.)  Moreover, they assert that Federal Regulations such as 21 C.F.R § 123.3 and 126.6(c)(i) constitute proof that such methods exist, and thus, Defendants should have taken the appropriate methods to ensure the safety of their product.  (Docket No. 32 ¶ 5.)   On the other hand, Defendants do not deny the existence of methods to detect the presence of natural toxins or saxitoxin in fish products, they do, however, deny having a legal obligation of detecting such natural toxins in their imported fish products. (Docket No. 60 at 12.)

In fact, whether the presence of saxitoxin was detectable at the time of the events is currently the subject of the ongoing discovery process taking place in this litigation.  Nevertheless, considering that this issue will very likely proven based on expert scientific testimony, its determination is one that goes to the weight of the evidence and thus, is one for the fact-finder to determine, in this case the jury.  See Chapman v. E.S.J. Towers, Inc., 803 F. Supp. 571, 574 (D.P.R. 1992).

### III.     Certification to the Puerto Rico Supreme Court

It is well-established that the decision to certify questions of state law is a discretionary one.  "Absent controlling state court precedent, a federal court . . . may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts would take is reasonably clear.'"  Van Haaren v. State Farm Mutual Automobile Insurance Co., 989 F.2d 1, 3 (1st Cir. 1993) (citing Porter v. Nutter, 913 F.2d 37, 41 n.4 (1st Cir. 1990); see also Collazo-Santiago v. Toyota Motor Corp., 937 F. Supp. 134, 138 (D.P.R. 1996) aff'd, 149 F.3d 23 (1st Cir. 1998).  "[I]f the existing case law does not provide sufficient guidance to allow [the court]

14

CIVIL NO. 14-1507 (GAG)

reasonably to predict how the state's courts would resolve the question, the prudent course is to certify the question to that court better suited to address the issue." Pagan-Colon v. Walgreen of San Patricio, Inc., 697 F.3d 1, 18 (1st Cir. 2012).

### A.     Principles of Comity and Federalism

The idea of comity[8] between local and federal courts is not a trifling concept.  Comity is "'neither a matter of absolute obligation, on the one hand, nor a mere courtesy and good will, upon the other.'"  See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 409 (1964) (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)).  The mutual respect between state and federal courts affords the participants a timely resolution of matters and a sense of finality.  See Martínez v. Ryan, 132 S. Ct. 1309, 1316 (2012).  Federalism simply describes the "legal relationship and distribution of power between" the federal and state governments, but recent jurisprudence seems to expand the working definition of federalism to incorporate "cooperative federalism."[9] BLACK'S LAW DICTIONARY 687 (9th ed. 2009); see Cullen v. Pinholster, 131 S. Ct. 1388, 1401 (2011) (explaining virtues of "comity, finality, and federalism" in the habeas corpus context).  Together, these principles guide the court when tasked to interpret new areas of local law.

Rather than boldly asserting itself as the ultimate authority of local law, a federal court should afford the local judiciary the opportunity to be the first to rule on the legality or constitutionality of local law.  See  Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 40 F.3d 18, 24 (1st Cir. 1994).  This can be achieved by invoking abstention doctrines or by certification.  See Sullivan v. City of Augusta, 511 F.3d 16, 44 (1st Cir. 2007).  The certification

---

[8] Comity is defined as the practice among political entities (as nations, states, or courts of different jurisdictions), involving especially mutual recognition of legislative, executive, and judicial acts.  BLACK'S LAW DICTIONARY 303-04 (9th ed. 2009).

[9] Cooperative federalism is defined as the distribution of power between the federal government and the states in which each recognizes the powers of the other while jointly engaging in certain governmental functions. BLACK'S LAW DICTIONARY 687 (9th ed. 2009).

CIVIL NO. 14-1507 (GAG)

mechanism is widely applauded as increasing the likelihood of a federal court answering the

substantive question correctly and demonstrating a federal court's respect for the state court.  See

Rebecca Hollander-Blumoff, The Psychology of Procedural Justice in the Federal Courts, 63

HASTINGS L.J. 127, 169 (2011) (stating benefits of certification are "getting the legal question

substantively correct[,] . . . not creating contrasting precedent [between the state and federal courts,

and] . . . signals respect and deference to the state court system's capabilities to determine its own

state law");  Examining the Power of Federal Courts to Certify Questions of State Law, 88

CORNELL L. REV. 1672, 1697 (2003) ("[C]ertification offers a federalism benefit to federal courts.

Insofar as it allows a state court to determine pertinent issues of state law, certification spares a

federal court the difficult chore of determining state law.").  It is with the utmost respect for the

Puerto Rico Supreme Court that the court submits this question.

### B.    Discussion

After deciding Mendoza, the Puerto Rico Supreme Court has not re-visited the issue of

strict liability with respect to food products.  See, e.g., Montero-Saldaña, 107 P.R. Dec. 452 (1978)

(manufacturing defects in vehicles);  Aponte v. Sears Roebuck, 144 P.R. Dec. 830 (1998)

(fabrication defects of a vehicle battery); SLG Hernandez Villanueva v. Hernandez, 150 P.R. Dec.

171 (2000) (holding that summary judgment is not proper when issue of fact exists as to whether

the manufacturer of a product—in this case a liquid drain cleaner—failed to adequately warn

consumers of a product's defects).

In Montero-Saldaña, the court clarified that "the defect which gives rise to the application

of the strict liability doctrine includes both a defect in manufacture and a defect in design.  A

defect can arise from the designer's mind as well as from the workman's hand."  P.R. Offic. Trans.

at 510 (internal quotations omitted).  The present question before this court is what about those

CIVIL NO. 14-1507 (GAG)

"defects" that are products of the forces of nature?  Should a supplier/seller be liable for the natural

defects contained in its product?

Whether the strict liability doctrine applies to defects of food products that have not been

manufactured or fabricated has not been addressed by the Puerto Rico Supreme Court.  The

undersigned deems this question of law vital to the resolution of instant case, and, as such, without

local precedent to guide this court's ruling, the undersigned is unable to move this litigation

forward.

As such, the court **CERTIFIES** the following question to the Puerto Rico Supreme Court:

**Under the principles of product liability, is a supplier/seller strictly liable for the damages caused by human consumption of an extremely poisonous natural toxin found in a shrimp, even if said food product (and its "defect") are not a result of manufacturing or fabrication process?**

**If the previous question is answered in the affirmative, would it make a difference if the "defect" of the food product is readily discoverable scientifically or otherwise?**

See P.R. LAWS ANN. tit. 4, app. XXI–A R. 25 (1996) (authorizing Puerto Rico Supreme Court to

entertain certification of questions from other jurisdictions);  Romero v. Colegio de Abogados de

P.R., 204 F.3d 291, 305-306 (1st Cir.  2000) (ordering federal district court to certify question to

Puerto Rico Supreme Court to avoid unnecessary resolution of unsettled matter of Commonwealth

law).

i.    Unsettled Issue: Strict Liability in Food Products

Although this issue is fairly new in Puerto Rico, it has been entertained in other

jurisdictions.  "Historically, potentially hazardous food products have been given additional

scrutiny by courts because they are apt to spoil and are not typically "designed" or "manufactured"

in the same sense as textiles and other consumer products, but rather captured from nature by

CIVIL NO. 14-1507 (GAG)

farmers and ranchers."  Damian C. Adams et al., <u>Déjà Moo: Is the Return to Public Sale of Raw Milk Udder Nonsense?</u>, 13 Drake J. Agric. L. 305, 320 (2008) (footnotes omitted).[10]

In suggesting how the court should steer its analysis, the parties set forth drastically opposing interpretations of what they contend is the applicable law.  The crux of their argument lies on their different readings of Section 402(A) of the Restatement of Torts (Second) ("Section 402(A)") and its application to the instant case.  Section 402(A) "Special Liability of Seller of Product for Physical Harm to User or Consumer" states that:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if: (a) the seller is engaged in the business of selling such a product, and, (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although: (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement of Torts (Second) § 402A (Am. Law Inst. 1965).

In their reply, Defendants contend that Plaintiffs are misleading the court by arguing that under the governing precedent this court's reasoning should strictly follow Section 402(A).  (<u>See</u> Docket No. 91.)  Namely, they argue that, on two occasions, the Puerto Rico Supreme Court has declined to follow Section 402(A).  <u>See</u> <u>Montero Saldana</u>, P.R. Offic. Trans. at 509-510, and <u>Rivera</u>, Offic. Trans. Slip Op. at 7.

---

[10] <u>See generally</u>  <u>Heise v. Gillette</u>, 83 Ind. App. 551 (Ind. App. 1925) (stating that there is an implied warranty that food is wholesome); <u>Stewart v. Martin</u>, 181 S.W.2d 657, 658 (Mo. 1944) (stating that the sale of unwholesome food would impose absolute liability on the seller for breaching the implied warranty of fitness); <u>S.H. Kress & Co. v. Ferguson</u>, 60 S.W.2d 817, 822 (Tex. Civ. App. 1933) (holding that an implied warranty of fitness accompanies the sale of food for immediate consumption).

CIVIL NO. 14-1507 (GAG)

1    Plaintiffs sur-replied, opposing Defendants' interpretation of the law, asserting the public

2 policy behind the strict liability doctrine to support its argument that in <u>Mendoza</u>, the Puerto Rico

3 Supreme Court incorporated Section 402(A)'s language in its totality. (Docket No. 97 at 3.)

4 Consequently, Plaintiffs posit that Section 402(A)'s strict liability applies to both processed and

5 unprocessed foods.  <u>Id.</u>   As such, they further argue that the <u>Mendoza</u> ruling applies to sellers of

6 defective food products, without any qualification or limitation.  (Docket No. 97.)

7    The case law cited above clearly demonstrates that the Puerto Rico Supreme Court's

8 adherence to Section 402(A) of the Restatement has not been uniform, but rather on a case by case

9 basis.  <u>See</u>  H. Brau del Toro, L<small>OS</small> D<small>AÑOS</small> Y P<small>ERJUICIOS</small> E<small>XTRACONTRACTUALES</small> <small>EN</small> P<small>UERTO</small> R<small>ICO</small>

10 916 (Pub. JTS, 2nd ed., 1986); <u>see</u>, <u>e.g.</u>, <u>Rivera</u>, Offic. Trans Slip Op. at 7 n.6 (citing <u>Montero-</u>

11 <u>Saldaña</u>, P.R. Offic. Trans. at 509-510) ("The product's defect need not be unreasonably

12 dangerous to the consumer or buyer as provided in [§]402(A)."). In <u>Rivera</u>, the Puerto Rico

13 Supreme Court opted to distanced its holding from Section 402(A) and chose to follow <u>Cronin v. J.</u>

14 <u>B. E. Olson Corporation</u>, 501 P.2d 1153 (Cal. 1972), and <u>Barker v. Lull Engineering Co., Inc.</u>, 573

15 P.2d 443 (Cal. 1978), "reject[ing] 'the concept of 'unreasonably dangerous conditions for the user'

16 set forth in the Restatement and h[olding] that for the doctrine of strict liability to be applied it was

17 enough to remain within the statements in the <u>Greenman</u> case transcribed above since it provides

18 'clear and plain evidence for determining if the injured plaintiff has the right to compensation.'"

19 <u>Rivera</u>, Offic. Trans Slip Op. at 7 n.6.

20    Due to the lack of precedent on this issue, this court does not know, and is in no position to

21 decide, whether the strict liability principle under Puerto Rico law should rigorously follow the

22 norm set forth in Section 402(A) of the Restatement or if this would constitute a situation in which

23 Puerto Rico civil law deviates from the Restatement.   Moreover, if this court were to apply strict

24

CIVIL NO. 14-1507 (GAG)

liability to this factual scenario, it would have to decide which test the Puerto Rico Supreme Court would use to determine the adequacy of the product and whether the alleged defect complies with the requisite standard.

ii.   Doctrines and rules in other jurisdictions

A study of the evolution of the strict liability doctrine in other jurisdictions shows that different tests and exceptions have been created over time to determine the suitability of the food product in question.

There are two commonly applied tests used to determine whether food products are merchantable.  Not coincidentally, these tests are very similar to strict products liability tests.  The two most common tests are the *foreign-natural test* or the *reasonable expectations test* based on what an ordinary consumer might expect to be in the food."  13 Drake J. Agric. L. at 337.

*1.   The foreign/natural test*

In <u>Mexicali Rose v. Superior Court</u>, 4 Cal. Rptr. 2d 145, 155 (Cal. 1992) the California Supreme Court clarified that the *foreign-natural test* adopted in <u>Mix v. Ingersoll, Candy Co.</u>, 6 Cal.2d 674 (Cal. 1936), should only apply "to claims arising under strict liability and not to negligence causes of action."  <u>Kilpatrick v. Superior Court (Holiday Inns, Inc.)</u>, 11 Cal. Rptr.  2d 323, 326 (1992).  "If the injury-producing substance is ***natural*** to the preparation of the food served, it can be said that it was reasonably expected by its very nature and the food cannot be determined unfit or defective.  Thus, a plaintiff in such a case has no cause of action in implied warranty or strict liability."  <u>Mexicali Rose</u>, 4 Cal.Rptr. 2d at 155 (emphasis provided).

Originally, some courts reasoned that the foreign/natural test does not apply to "natural" materials in food products.  "Using this rule, consumers can recover for injuries caused by an unexpected foreign substance in the food (e.g., a nail in a can of spinach), but not for those caused

CIVIL NO. 14-1507 (GAG)

by "natural" materials like salmonella in chicken." 13 Drake J. Agric. L. 305, 337-38.   However, in Kilpatrick, 11 Cal.Rptr. 2d 323, the California Supreme Court, in the wake of  Mexicali Rose, clarified and extended the scope of the term "natural" of the foreign/natural test, by applying the test to a case involving raw oysters containing vibrio cholera bacteria. 11 Cal.Rptr. 2d 323.

In the recent decades there has been a doctrinal evolution that has modified both tests, with a tendency to incline in favor of the reasonable expectations test.  California, like many other jurisdictions, has further delineated the differences between the *foreign/natural test* adopted in Mix, 6 Cal.2d 674 and the *reasonable expectations test*.  See also Mexicali Rose, 4 Cal. Rptr. 2d 145;  Ex parte Morrison's Cafeteria of Montgomery, Inc., 431 So. 2d 975 (Ala. 1983).

*2.   The reasonable expectations test.*

The Mexicali Rose court further evolved and differentiated the *foreign/natural test* which focuses on the nature of the object in the food, from the *reasonable expectations test*, that focuses on whether a customer could reasonably expect to find the object in the food.  4 Cal. Rptr. at 154. The *reasonable expectation test* differs from the foreign/natural test mainly in that (1) it is a question of fact as to whether the injurious substance is to be anticipated and (2) the focus is not on the components of the dish but rather on the completed product, considering the nature of the dish and the nature of its preparation.  4 Cal. Rptr. at 154.

> The expectations of the consumer do not, however, negate a defendant's duty to exercise reasonable care in the preparation and service of the food. Therefore, if the presence of the natural substance is due to a defendant's failure to exercise due care in the preparation of the food, an injured plaintiff may state a cause of action in negligence. By contrast, if the substance is foreign to the food served, then a trier of fact additionally must determine whether its presence (i) could reasonably be expected by the average consumer and (ii) rendered the food unfit for human consumption or defective under the theories of the implied warranty of merchantability or strict liability.

Mexicali Rose , 4 Cal. Rptr. at 154-155.   For this test, "[c]ourts typically consider the relevant context of consumption —if the ordinary consumer is aware of any naturally-occurring, potentially

CIVIL NO. 14-1507 (GAG)

unhealthy characteristics of raw milk, these characteristics do not necessarily make the product defective.  For example, tobacco, alcohol, raw seafood, and butter are not considered defective despite their inherent danger because the public is sufficiently aware of their potential harm."  13 Drake J. Agric. L. at 330 (citing Pelman v. McDonald's Corp., 237 F. Supp. 2d 512, 531-35 (S.D.N.Y. 2003) (recognizing that expectations about food contents are ever-changing)).  See also Clime v. Dewey Beach Enters. Inc., 831 F. Supp. 341, 350 (D. Del. 1993) (finding reasonable expectation that eating raw shellfish can carry the risk of disease and bacterial infestation, such as vibrio septicemia);  Cain v. Sheraton Perimeter Park S. Hotel, 592 So. 2d 218, 223 (Ala. 1991) (holding that summary judgment was improper due to the existence of genuine issue of material facts regarding whether a reasonable consumer might have expected that raw oysters may have been contaminated);  Edwards v. Hop Sin, Inc., 140 S.W.3d 13, 16 (Ky. Ct. App. 2003) (applying the reasonable expectation test after concluding that a reasonable consumer, in 1998 was probably not aware that raw seafood poses a certain risk of mild illness and expected a warning);  Jackson v. Nestle-Beich, Inc., 589 N.E. 2d 547, 548 (Ill. 1992) (the reasonable expectation test, rather than the foreign-natural doctrine, would be used to determine liability of vendor of food product for injuries caused by ingredient in the food);  Simeon v. Doe, 602 So.2d 77 (La.App. 1992), aff'd in part, rev'd in part, 618 So.2d 848 (La.1993) (finding that oysters containing vibrio vulnificus were not unmerchantable under the foreign-natural test since bacteria are natural to the shellfish);  Adams v. Great Atl. & Pac. Tea Co., 112 S.E.2d 92, 98 (N.C. 1960) (concluding that a consumer can be expected to anticipate a crystallized grain of corn in a box of corn flakes);  Goodman v. Wenco Foods, Inc., 423 S.E.2d 444 (N.C. 1992) (applying the reasonable expectation test and holding that a jury could reasonably determine the meat to be of such a nature, i.e., hamburger, and the bone in the meat of such a size that a consumer of the meat should not reasonably have anticipated the

CIVIL NO. 14-1507 (GAG)

bone's presence);  Langiulli v. Bumble Bee Seafood, Inc., 604 N.Y.S.2d 1020, 1021 (N.Y. Sup. Ct. 1993) (abolishing the foreign/natural test in favor of the reasonable expectation test);  Allen v. Grafton, 164 N.E.2d 167, 175 (Ohio. 1960) (holding that a small piece of shell in a fried oyster is natural and can be reasonably anticipated);  Betehia v. Cape Cod Corp., 10 Wis.2d 323 69 (Wis. 1960) (presence in the sandwich of the chicken bone, stating that the test for whether food is defective is whether the consumer reasonably expected the foreign object, not whether the object was merely foreign or natural).

Puerto Rico law is unclear as to the application of the strict liability doctrine to situations that are highly improbable or unforeseeable.  Brau del Toro, LOS DAÑOS Y PERJUICIOS EXTRACONTRACTUALES EN PUERTO RICO, at 905.  Under Section 402(A), some jurisdictions have found strict liability appropriate "for damages arising from an allergenic, idiosyncratic, or side-effect reaction to its product where it has failed to give adequate and timely warning with respect thereto."  53 A.L.R.3d 298, (Products liability: strict liability in tort where injury results from allergenic (side-effect) reaction to product).  Nevertheless, in Mountain v. Procter & Gamble Co., 312 F. Supp. 534 (E.D.Wis. 1970), a defendant manufacturer was not found liable for failure to warn a product's unknown dangers.  "[T]he strict tort liability doctrine as enunciated in § 402A of the Second Restatement of Torts was not applicable where the defendant manufacturer did not know, or could not reasonably have known, of the danger."  53 A.L.R.3d 298; see also  Brau del Toro, LOS DAÑOS Y PERJUICIOS EXTRACONTRACTUALES EN PUERTO RICO, at 905.  The same reasoning has been followed when known dangers are highly unlikely and could only impact a handful of consumers.[11]  However, the liability is imposed for failure to warn the consumer that

---

[11]   In Mountain, the court reasoned that a warning was required only when the product contained an ingredient to which a substantial number of the population were allergic, and the facts of the case established that such substantial number were not allergic to the particular product involved in the case. 312 F. Supp. 534.

CIVIL NO. 14-1507 (GAG)

those "highly improbable" damages may occur.  "Liability for failure to warn will be imposed only if manufacturer has actual knowledge that product might cause harm to identifiable class of sensitive users, or if based on state of scientific knowledge, manufacturer is chargeable with such knowledge." 53 A.L.R.3d 298; see also Tinnerholn v. Parke-Davis, 411 F.2d 48 (2nd Cir. 1969); Culpepper v. Volkswagen of Am., Inc., 109 Cal. Rptr. 110 (Ct. App. 1973) (citing Cronin, 8 Cal.3d at 126) (holding that "strict liability should not be imposed upon the manufacturer (or distributor) when injury results from the use of its product that is not reasonably foreseeable, and while a collision may not be the normal or intended use of a vehicle, vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products.")).

If the strict liability principle is not applicable to the instant case, Plaintiffs would proceed with their other claims, including the general negligence claim under Article 1802.  In doing so, Plaintiffs would have a higher burden to prove, that is, that Defendants were negligent and that there is a nexus between said negligence and the damages suffered.  Either way, in order to proceed, the court must determine whether Plaintiffs' strict liability claim proceeds as a matter of law.

**IV.    Conclusion**

This court **ABSTAINS** from ruling on Defendant's dismissal of Plaintiffs' strict liability claim at Docket No. 60, pending certification to the Puerto Rico Supreme Court.  See P.R. LAWS

---

See also 53 A.L.R.3d 239 (Failure to warn as basis of liability under doctrine of strict liability in tort); 2 A.L.R.5th 1 (citing Kilpatrick v Superior Court, 277 Cal.Rptr. 230 (Cal. Ct. App. 1991) (holding it was an "error to grant summary judgment to a restaurant operator and its oyster suppliers in a consumer's breach of warranty and strict liability action alleging personal injuries resulting from eating raw oysters, served to him by a restaurant operator, which were tainted with vibrio cholerae, an aquatic bacterium present in estuarine environments of the United States, Canada, and other parts of the world, which do not affect the oysters' taste, smell, or appearance, but are transmitted to the eater. The potential for causing disease in the eater is greater for persons with impaired immunity, which was the case with the plaintiff, who was an alcoholic.")).

**CIVIL NO. 14-1507 (GAG)**

1   ANN. tit. 4, app. XXI–A R. 25 (1996) (authorizing Puerto Rico Supreme Court to entertain

2   certification of questions from other jurisdictions); <u>Romero</u>, 204 F.3d at 305-306 (ordering

3   abstention pending resolution of certified issue).

4        The court **CERTIFIES** the following question to the **Puerto Rico Supreme Court**:

5        **Under the principles of product liability, is a supplier/seller strictly liable for
6        the damages caused by human consumption of an extremely poisonous
         natural toxin found in a shrimp, even if said food product (and its "defect")
7        are not a result of manufacturing or fabrication process?**

8        **If the previous question is answered in the affirmative, would it make a
         difference if the "defect" of the food product is readily discoverable
9        scientifically or otherwise?**

10       The Clerk of Court shall transmit this certification to the Clerk of the Puerto Rico Supreme

11   Court pursuant to P.R. LAWS ANN. tit. 4, app. XXI-A, 25 on October 1, 2015.

12
13       **SO ORDERED.**

14   In San Juan, Puerto Rico this 11th day of September, 2015.

15                                          *s/ Gustavo A. Gelpí*
                                            GUSTAVO A. GELPI
                                            United States District Judge

25